# 22-2960

**IN UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT**
_____

WILLIAM SALIER; KARLA SALIER,

*Plaintiffs-Appellants*,

v.

WALMART, INC.; HY-VEE, INC.

*Defendants-Appellees*,

_____

On Appeal from the United States District of Minnesota
No. 0:22-cv-00082-PJS-ECW
_____

**BRIEF OF THE PLAINTIFFS-APPELLANTS**
_____

Norman A. Pattis
383 Orange Street, 1st Floor
New Haven, Connecticut 06511
Phone: (203) 393-3017
Fax: (203) 393-9745
Email: npattis@pattisandsmith.com
*Attorney for Plaintiffs-Appellants*

December 9, 2022

## Summary of the Case

The plaintiffs-appellants, hereinafter "plaintiffs," contend that the defendants-appellees, hereinafter "defendants," who operate pharmacies that fill prescriptions ordered by independent physicians, unlawfully prevented them from getting "off label" medication to treat COVID-19.

The District Court dismissed, pursuant to F.R.C.P. 12(b)(6), concluding that the plaintiffs had failed to state a claim for which relief could be granted.

The plaintiffs claim the District Court erred as a matter of law in concluding that there could be no proof of a common law right to self-determination on the facts alleged; second, in holding that, as a matter of law, there is nothing extreme and outrageous about the defendants' conduct, and; third, in ruling that an expert was required to support or their claims, and in not providing counsel for the plaintiffs additional time to consult an expert if one was necessary at all.

The plaintiffs request 10 minutes for oral argument.

The common law claim is one of first impression in Minnesota.

Appellate Case: 22-2960    Page: 2    Date Filed: 12/09/2022 Entry ID: 5225458

## **Disclosure Statement**

The Plaintiffs-Appellants are both individuals bringing the action in their own names and asserting their own interests. Neither are affiliated with another entity having an interest in this case.

ii

# Table of Contents

Summary of the Case ................................................................ i

Disclosure Statement............................................................... ii

Table of Contents .................................................................. iii

Table of Citations................................................................. 1

Jurisdictional Statement........................................................... 3

Statement of the Issues............................................................ 4

Statement of the Case.............................................................. 6

Summary of the Argument............................................................ 8

Argument........................................................................... 14

I.    The District Court Erred In Concluding That Minnesota Does Not

Recognize A Common Law Right To Self-Determination ................................ 14

    A.   Standard of Review ................................................. 14

    B.   The Fundamental Principle Of Medical Self-Determination Is

Recognized In Minnesota; The Plaintiffs Sought To Gain Recognition Of A

Corollary To That Right............................................................ 14

Appellate Case: 22-2960   Page: 4   Date Filed: 12/09/2022 Entry ID: 5225458

C.  Determining Whether Minnesota Will Recognize The Right Asserted Here Requires Certification To The Minnesota Supreme Court .....................19

II.  The District Court Erred In Concluding That, As A Matter Of Law, That The Plaintiffs Could Not Make Out A Claim For Intentional Infliction Of Emotional Distress ...............................................21

A.  Standard of Review ................................21

B.  Corporate Interference With The Prescription Authority Of Physicians To Care For Their Patients Is Extreme And Outrageous................................22

III.  The District Court Erred Both In Holding That A Medical Expert Was Necessary To Perfect The Claims Alleged, And, More Significantly, In Refusing Additional Time To The Plaintiffs' To Notice Such An Expert If One Was, In Fact, Necessary ..............................27

A.  Standard of Review ................................27

B.  A Medical Expert Is Not Required To Establish That Corporations Ought Not To Be Permitted To Interfere With A Physician's Ability To Prescribe "Off-Label" Medications; If One Were Truly Necessary, The Plaintiffs Should Have Been Given Additional Time To Produce The Required Affidavit ...............................27

Conclusion ...............................29

iv

Certificate of Compliance ...........................................................................31

Certificate of Service ................................................................................32

Addendum ...............................................................................................33

v

# Table of Citations

**Federal Cases**

*Anderson v. Creighton*, 483 U. S. 635, 640 (1987) ...................................................15

*Aten v. Scottsdale Ins. Co.*, 511 F.3d 818, (8th Cir. 2008) ........................................12

*Chizmadia v. Smiley's Point Clinic*, 873 F.2d 1163, 1165 (8th Cir. 1989.) ..............5

*Coleman v. Watt*, 40 F.3d 255, 258 (8th Cir., 1994)..................................................14

*Micek v. Mayo Clinic*, 2021 WL 5282755 at 2 n.2 (D. Minn. 2021) ......................23

*New State Ice. Co. v. Liebmann*, 285 U.S. 262, 310 (1932) .......................................8

*Perkins v. Clark Equip. Co*, 823 F.2d 207, 209 (8th Cir. 1987)...............................21

**Minnesota State Cases**

*Anderson v. Rengachary*, 608 N.W.2d 843, 850 (Minn. 2000)...............................29

*Cornfeldt v. Tongen*, 262 N.W.2d 684, 702-702 (Minn. 1977)...........................4, 16

*Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 864 (Minn. 2003)................... 4, 23, 24

*Lea v. Heritage Auctions, Inc. (In re Gillman)*, 806 N.W.2d 861, 866 (Minn. Ct.

   App. 2011). ............................................................................................16

*Mumms v. Morson*, 708 N.W.2d 475, 491 (Minn. 2006) ........................................18

*State v. Misquadace*, 629 N.W.2d 487, 490 n.2 (Minn.App. 2001), aff'd, 644

   N.W.2d 65 (Minn. 2002)........................................................................16

*State v. Ranier*, 258 Minn. 168, 177 (1960) ..........................................................16

1

*State v. Whipple*, 143 Minn, 403, 406 (1919) ..........................................................18

**Other Cases**

*Schloendorff v. Society of New York Hospital*, 211 N.Y. 125 (1914) ....................15

**Statutes**

Minn. Stat. § 145.682 ........................................................................... 28, 29

**Regulations**

Minn. R. § 6800.3110 subp. 4 .......................................................................24

**Other Authorities**

*Black's Law Dictionary* 1177 (9th Ed. 2009) ............................................................16

*Merriam-Webster's Dictionary.* (https://www.merriam-
    webster.com/dictionary/principle (last accessed December 2, 2022)...................17

Oliver Wendell Holmes, Jr. *The Common Law* (1881) ............................................15

2

## Jurisdictional Statement

The District Court action asserted diversity jurisdiction pursuant to 28 U.S.C. §§ 1332. The appellants commenced the underlying civil action in the District of Minnesota on January 13, 2022 and filed an Amended Complaint on February 3, 2022. Thereafter, the appellees moved to dismiss. A final judgment dismissing the appellants' claims was entered on August, 22, 2022, and the notice of appeal was filed on September 16, 2022. Jurisdiction of this Court is invoked after a final judgment of the District Court granting the appellees' motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and after the entry of a final judgment in favor of the defendants. This brief was timely filed and has been perfected in accordance with the rules of this Court.

Appellate Case: 22-2960    Page: 9    Date Filed: 12/09/2022 Entry ID: 5225458

## **Statement of the Issues**

I.    **Whether The District Court Erred In Concluding That Minnesota Does Not Recognize A Common Law Right To Self-Determination?**

Apposite Cases:

*Cornfeldt v. Tongen*, 262 N.W.2d 684, 702-702 (Minn. 1977).

*Perkins v. Clark Equip. Co*, 823 F.2d 207, 209 (8thCir. 1987).

II.   **Whether The District Court Erred In Concluding That, As A Matter Of Law, That The Plaintiffs Could Not Make Out A Claim For Intentional Infliction Of Emotional Distress?**

Apposite Case:

*Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 864 (Minn.

2003).

III.  **Whether The District Court Erred Both In Holding That A Medical Expert Was Necessary To Perfect The Claims Alleged, And, More Significantly, In Refusing Additional Time To The Plaintiffs' To Notice Such An Expert If One Was, In Fact, Necessary?**

Apposite Case:

4

*Chizmadia v. Smiley's Point Clinic*, 873 F.2d 1163, 1165 (8th Cir. 1989).

5

## Statement of the Case

The plaintiffs sought treatment of their COVID-19 symptoms by means of treatment disfavored my many medical professionals: the use of Ivermectin and hydroxychloroquine, both of which cannot be obtained without a prescription. Their physician prescribed the medications. The prescription was considered "off label," that is, the medications were to be used in a manner outside of the customary uses. When the plaintiffs took the prescriptions to their local pharmacists, the pharmacists refused to fill them, on grounds that company policy forbade dispensing these drugs for the uses to which the plaintiffs' physician prescribed them. When the plaintiffs' physician discussed the medical necessity of this "off-label" use of the prescriptions with the pharmacists, the pharmacists refused to listen, insisting that company policy forbade the use of the drugs in the manner the physician wanted them to be used.

The plaintiffs sought relief in the District Court, claiming that the defendants, a local Walmart and a local pharmacy, Hy-Vee, had tortiously interfered with their relationship with their doctor, had unlawfully abridged their common-law right to bodily integrity and self-determination, and had intentionally inflicted emotional distress on them.

6

Appellate Case: 22-2960    Page: 12    Date Filed: 12/09/2022 Entry ID: 5225458

The defendants moved dismissal claiming that the plaintiffs had failed to state a claim under Federal Rules of Civil Procedure 12b(6). The Court granted the motion as to all claims and entered judgment in favor of the defendants.

Thereafter the plaintiff filed a timely notice of appeal, and submitted this brief and appendix in accordance with the rules of this Court.

The plaintiffs seek reversal of District Court ruling. As to the claim of a breach of the common law right to self-determination, the plaintiffs seek certification to the Minnesota Supreme Court of the following question: Whether a pharmacist refusing to fill the prescription of a duly-licensed physician breaches a patient's right to self-determination.

7

## Summary of the Argument

COVID-19 caught an unprepared nation by surprise, and the states and federal governments struggled throughout the pandemic to arrive at an effective and coordinated response that honored both the principles of federalism and the separation of powers doctrine. The response of corporations and private health-care providers was also uncoordinated and at times confusing. The result was an ad hoc series of decisions that resulted in inconsistent policies and, undoubtedly, loss of life. Individual citizens were left to sort through conflicting messages and options, both as to avoidance of the illness, and for how best to treat the illness when they contracted it.

That is, perhaps, as it should be under our law. Our institutions were designed to diffuse power. Our Courts refer to the states as laboratories of democracy. *New State Ice. Co. v. Liebmann*, 285 U.S. 262, 310 (1932) (Brandeis, J., dissenting). We lack a centralized mechanism to impose uniform public health requirements throughout the nation as a whole. States retain police powers, and, at the federal level, the separation of powers doctrine creates a series of checks and balances designed to prevent too much power to amass in any one set of hands.

Individuals are left to cope as best they can when governments collide and disagree. They are free to seek medical care from the physicians of their choice.

Appellate Case: 22-2960    Page: 14    Date Filed: 12/09/2022 Entry ID: 5225458

And those physicians – licensed professionals – are free to disagree about practices so long as their disagreements violate neither the standard of care in their profession nor the public regulations regarding provision of competent care. State and federal constitutions limit the reach of government; the common law sets minimal expectations for how individuals treat one another in private contexts. Even, or perhaps especially, in a public health crisis the sources of individual liberty and freedom are precious. That includes the autonomy necessary to make decisions about personal welfare.

In this case, the plaintiffs opted for unconventional treatment of COVID-19, seeking to use Ivermectin and hydroxychloroquine to treat their symptoms. Both treatments were disfavored by public health officials and most medical practitioners, including, as a matter of corporate policy, the defendants in this action. However, the plaintiffs found a physician who believed in the efficacy of these treatments. The physician prescribed the medications for the plaintiffs. When the plaintiffs presented the prescriptions to the defendants' pharmacies, pharmacists refused to fill them, relying on corporate policies. The pharmacists did not examine the plaintiffs and had no familiarity with their conditions or medical history. Apparently, when the plaintiffs' physician tried to discuss the matter with the pharmacists, the pharmacists refused to listen, deciding instead to lecture the physician about the scope and contour of their respective prescription policies.

9

Instead of playing the ministerial role of filling a prescription ordered by a physician, the pharmacists interposed the corporate judgment of their employers between patients and physician. The plaintiffs sought no medical treatment from the pharmacists, yet the pharmacists denied them the treatment their doctor ordered, this despite speaking with the physician to make sure there was no error in the prescriptions themselves.

The plaintiffs sought relief in the District Court, asserting various theories designed to address the defendants' decision to block the filling of the prescriptions ordered by their physician. They claimed that the defendants interfered with their common law right to self-determination, that the defendants engaged in intentional infliction of emotional distress, and that the defendants tortiously interfered with the contractual expectations. The District Court granted the defendants motion to dismiss, ruling that the plaintiffs failed to state a claim. The District Court also refused to certify a state law question of first impression to the Minnesota Supreme Court involving the common law claim of a violation of the right to self-determination. Finally, the District Court held that plaintiffs' failure to represent that a medical doctor had opined that the defendants' behavior amounted to malpractice was a fatal jurisdictional error. The District Court also concluded, as a matter of law, that the pharmacists conduct in enforcing their policies did not amount to intentional infliction of emotional distress. The plaintiffs

10

seek review of the lower Court decision for the common-law claim and the intentional infliction of emotional distress claim. They do not seek review of the tortious interference claim.

The plaintiffs claim that Minnesota does recognize a fundamental principle of self-determination with regard to medical decision making as reflected in the state's embrace of the informed consent doctrine. A corollary of that right is the right to choose a doctor and to submit oneself to the doctor's care. In this case, the plaintiffs were prescribed medication by their physician, and corporate employees of companies maintaining pharmacies refused to fill the prescriptions as they were "off label." The pharmacists did this even after speaking to the physician to determine whether the prescriptions were made in error. The pharamacists' role in this case was ministerial. By following their corporate directives, they were not engaged in providing care or in evaluation the patients. By interposing corporate policy between the plaintiffs and their physicians, they violated the patients' right self-determination in medical decision making. The conduct of the defendants was extreme and outrageous, heightening the plaintiffs fear of death or undue suffering. As they were not claiming medical malpractice or application of esoteric medical standards by the defendants, no expert was necessary to establish their claim that their right to self-determination was breached. If such an expert was, in fact,

11

necessary, they should have been given more time to find one so that this case could be decided on the merits.

Because the scope of the self-determination claim is an issue of first impression in Minnesota, the issue of whether such a right exists at all should be certified to the Minnesota Supreme Court.

All of the claims on appeal are rooted in the following facts, which, for purposes of appellate review, are presumed to be true. *Aten v. Scottsdale Ins. Co.*, 511 F.3d 818, 820 (8th Cir. 2008).

Mr. and Mrs. Salier are Minnesota residents. (App. at 3, R. Doc. 9 at 1.) The defendants are corporations operating in Minnesota but incorporated, and with headquarters in, other states. (App. at 4., R. Doc. 9 at 4.))

In October 2021 Mr. Salier contracted COVID-19, (App. at 4, R. Doc. 9 at 2.); thereafter, his wife also became ill with the virus, (App. at 6, R. Doc. 9 at 4). As Mr. Salier's condition worsened, he and his wife became increasingly desperate, fearing for his life. They learned through their own research about the potential efficacy of Ivermectin to treat COVID-19 symptoms. They were unable to find a Minnesota physician willing to prescribe it, but they did locate a Missouri physician, Dr. Mollie James, willing to do so in appropriate cases. Dr. James assessed Mr. Salier's condition as "extremely serious," with a substantial risk of death if he did not receive effective treatment immediately. She prescribed

12

Ivermectin, and sent a prescription for it to the Walmart pharmacy in Albert Lea, Minnesota. (App. at 5., R. Doc. 9 at 5.) A Walmart pharmacist called Ms. Salier to inform her that in Walmart's view it was not appropriate to treat COVID-19 patients with Ivermectin. (App. at 5, R. Doc. 9 at 3.) Ms. Salier pleaded that her husband's life was at risk; the pharmacist then proceeded to berate Ms. Salier about the appropriate use of Ivermectin. (App. at 5, R. Doc. 9 at 3.) Ms. Salier then asked Dr. James to beg for assistance; Dr. James called Walmart and was herself lectured about the appropriate use of Ivermectin. (App. at 6, R. Doc. 9 at 4.)

Ms. Salier then fell ill with COVID-19. Dr. James prescribed Ivermectin and hydroxychloroquine for her. She attempted to fill the prescription at a Hy-Vee supermarket in Albert Lea, Minnesota. She was informed that the pharmacy would not fill the prescriptions as a matter of corporate policy. (Id.)

The couple resorted to self-help, obtaining a veterinary version of Ivermectin and self-treating. Both recovered and are fine. (App. at 6-7, R. Doc. 9 at 4-5.) There was at the time the defendants refused to fill the Ivermectin prescriptions ample medical literature indicating that Ivermectin was a safe and efficacious treatment for COVID-19. (App. at 9, R. Doc. 9 at 7.)

13

**Argument**

## I. The District Court Erred In Concluding That Minnesota Does Not Recognize A Common Law Right To Self-Determination

### A. Standard of Review

"In considering a motion to dismiss, we must assume all the facts alleged in the complaint are true…. The complaint must be liberally construed in the light most favorable to the plaintiff. A Rule12(b)(6) motion to dismiss should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle the plaintiff to relief… Whether the complaint states a cause of action is question which this court reviews de novo…." *Coleman v. Watt*, 40 F.3d 255, 258 (8th Cir., 1994) (citations omitted).

### B. The Fundamental Principle Of Medical Self-Determination Is Recognized In Minnesota; The Plaintiffs Sought To Gain Recognition Of A Corollary To That Right.

The District Court made short work of the common-law claim involving self-determination: "this right does not exist in Minnesota or anywhere else." (Add. at 6.) The District Court's analysis was rigid and formulaic, more appropriate to a

14

narrow reading of the qualified immunity standard in a Section 1983 case than to the development of the common law. See, for example, *Anderson v. Creighton*, 483 U. S. 635, 640 (1987) (requiring that for state actors to be on notice of "clearly established law" there must be a fairly particular case having decided the issue; mere general principles do not suffice.) This was not a case about the law's logic; rather it was a case about applying existing common law to a tense and evolving situation. As Oliver Wendell Holmes, Jr., famously put it: "The life of the law has not been logic: it has been experience**.**" Oliver Wendell Holmes, Jr. *The Common Law* (1881). As pleaded in this case, the Saliers' experience cries out for legal remedy.

Minnesota recognizes the doctrine of informed consent. In a 1977 case decided by the Minnesota Supreme Court, the Court made clear that the doctrine sounds in the right of an adult to decide what shall be done with, or to, his or her own body. "Our society is morally and legally committed to the principle of self-determination, a corollary of which is the right of every adult to decide what shall be done with his own body." *Cornfeldt v. Tongen*, 262 N.W.2d 684, 702-702 (Minn. 1977), citing, *Schloendorff v. Society of New York Hospital*, 211 N.Y. 125 (1914).

The District Court relegates this philosophic mooring to the status of mere dicta unrelated to the holding. Suggesting the language in *Cornfeldt* is mere dictum is an invitation to error. "Dictum is a statement in an opinion that could have been eliminated without impairing the result of the opinion." *State v. Misquadace*, 629

Appellate Case: 22-2960    Page: 21    Date Filed: 12/09/2022 Entry ID: 5225458

N.W.2d 487, 490 n.2 (Minn. Ct. App. 2001), aff'd, 644 N.W.2d 65 (Minn. 2002). Dictum is divided into two categories: judicial dictum and obiter dictum. Obiter dictum is Latin for "something said in passing," *Black's Law Dictionary* 1177 (9th Ed. 2009), whereas judicial dictum involves a court's expression of its 'opinion on a question directly involved and argued by counsel though not entirely necessary to the decision.' *State v. Ranier*, 258 Minn. 168, 177 (1960)." *Lea v. Heritage Auctions, Inc. (In re Gillman)*, 806 N.W.2d 861, 866 (Minn. Ct. App. 2011).

A court could well have simply said the consent of a patient must be obtained to do something to their body. That is understandable enough. But our jurisprudence would be impoverished, and the common law would be starved of doctrinal coherence, if that is all courts did. Instead, we give reasons for holdings; rulings are explained. From these explanations grow the legal doctrines that create the settled expectations governing our lives.

*Corndfelt's* language about "the principle of self-determination, a corollary of which is the right of every adult to decide what shall be done with his own body," is more than something "said in passing," and cannot be passed off as mere obiter dictum. Neither, as a matter of grammatical construction, is it judicial dictum: the language recognizes an established principle, to wit: "the principle of self-determination,…" A principle is "a comprehensive and fundamental law, doctrine or assumption." *Merriam-Webster's Dictionary.* (https://www.merriam-

16

webster.com/dictionary/principle (last accessed December 2, 2022), From this fundamental doctrine of self-determination *Cornfeldt* drew a "corollary," to wit: informed consent. *Cornfeldt* at 701-702.

However entertaining the District Court's playful recitation of largely inapt hypotheticals may be, sarcasm is no substitute for careful analysis. Is "every doctor legally required to perform an abortion if a patient demands it?" Obviously not. "Is every nurse legally required to assist a patient in committing suicide?" The suggestion is ridiculous. "Is every pharmacist required to provide medical marijuana?" As always in the law, context matters. Pharmacists should be expected to fill a physician's orders; if the pharmacist cannot do so on grounds of principle, there are alternatives, such as, perhaps, employment elsewhere, or grounds for conscientious refusal to participate in discrete acts. But giving pharmacists a blanket refusal to fill a doctor's order is a bridge too far. (Add. at 7.)

It is no mere "prevarication" to say that corporate policy ought not to yield veto power over a duly licensed physician's decision to prescribe for a patient an "off label" use of a medication. The principle of self-determination, that fundamental foundation from which springs the right to self-determination, yields a different corollary: Corporate medicine cannot commandeer the physician-patient relationship. The plaintiffs, on the well-pleaded facts alleged, certainly are more than justified in requesting that this Court permit them to develop a further facts for

17

consideration on an adequate record by the District Court at the summary judgment stage on their claim that corporate policy interfered with their right to self-determination, a right expressed in this case by selection of the physician of their choice, and the decision to heed that physician's advice.

The plaintiffs did not go to the pharmacy for a second opinion; they went to get their doctor's orders filled. The pharmacists' acts were ministerial in character. An "employee's act is ministerial if he is bound to follow [a] policy" *Mumms v. Morson*, 708 N.W.2d 475, 491 (Minn. 2006). In this instance, the pharmacists were asked merely to furnish medication; they were not prescribers. The distinction between furnishing and prescribing is well known to the law. "There is a plain difference between 'prescribe' and 'furnish.' To prescribe is to give medical direction, to indicate remedies. To furnish is to supply or provide." *State v. Whipple*, 143 Minn, 403, 406 (1919).

The District Court was tone deaf to the teaching of the informed consent doctrine. We value a patient's right to withhold consent from treatment not out of some formulaic concern for formalities of a contract requiring just the right phrase to convey offer and/or acceptance, but because of the value we place on autonomy and bodily integrity.

It would be one thing if the plaintiffs asserted a categorical duty on the part of a pharmacist to fill a doctor's order no matter what that order was. Such a regime

18

could easily violate public policy. Pharmacists play a vital role in providing a second set of eyes capable of detecting contraindications and error. But in doing so they follow a policy designed and intended to protect patients from medication errors and from misuse of prescription authority. But in this case, as alleged, each pharmacist spoke to the prescribing physician ordering the prescription. There was no error. Rather than listening to the doctor, the pharmacists recited corporate policy. This act of corporate fiat deprived the plaintiffs of the right to the medical treatment of their choice with the physician of their choice. Put another way, the pharmacists failed to furnish what a physician prescribed, and they did so to the potential detriment of the patients seeking to rely on their doctor's advice. It is no great leap to say that just as a patient has a right to give informed consent about what is done to his body, he or she also has the right give informed consent about what to put into his or her body. The principal of self-determination easily extends to the medication corollary.

The record here is silent on facts necessary fully to evaluate this claim. Just what do the pharmacists acknowledge saying to the plaintiffs' doctor? What is the actual policy of the corporate defendants regarding the medications in question? Did the pharmacist actually follow the policies? Answering these questions requires discovery.

> ### C. Determining Whether Minnesota Will Recognize The Right Asserted Here Requires Certification To The Minnesota Supreme Court

Appellate Case: 22-2960     Page: 25     Date Filed: 12/09/2022 Entry ID: 5225458

But the District Court would have none of it, and for reasons that are not apparent from the face of the record. If the Court had serious reservations about self-determination in this context, it could have, and should have, certified the question to the Minnesota Supreme Court. But it refused, scornfully declaring:

> "[S]everal state courts have ruled that patients do *not* have a legal right – whether constitutional, statutory, regulatory, or common-law – to compel health-care providers 'to administer a treatment they do not wish to provide.' *Pisano v. Mayo Clinic Fla.*, 333 So.3d 782, 789 (Fla. Dist. Ct. App. 2022); see also, e.g., *DeMarco v. Christiana Care Health Servs.*, 263 A.3d 423, 434-37 (Del. Ch. 2021)(holding 'healthcare providers have no duty to administer ivermectin to a COVID-19 patient'); *Tex. Health Huguley, Inc. v. Jones*, 637 S.W.3d 202, 215-16 (Tex. App. 2021)(holding COVID-19 patient not entitled to injunction requiring hospital to administer ivermectin); *Abbinanti v. Presence Cent. & Suburban Hosps. Network*, 2021 IL App (2d) 210763 Para. 20(same).

(Add. at 8.)

This impressive recitation of persuasive authority may well lead Minnesota to decide likewise, but, the plaintiffs contend, that is a decision the Minnesota Supreme Court, and not a federal District Court judge, should make.

The Minnesota Supreme Court should have this opportunity to rule on this issue of first impression as to state law. Certification of what appears to be an issue of first impression deserves consideration by the state's high court. The plaintiffs contend that the District Court erred by concluding that because this issue raised is not a "close question," it is undeserving of certification. "[A]bsent a 'close' question and lack of state sources enabling a nonconjectural determination, a federal court

20

should not avoid its responsibility to determine all the issues before it." *Perkins v. Clark Equip. Co*, 823 F.2d 207, 209 (8th Cir. 1987). "This is not a close question." (Add. at 9.)

This is an issue of first impression that, as the District Court noticed in its memorandum of decision, has emerged in other states. The plaintiffs should not be deprived the right to have this claim decided by the Minnesota Supreme Court; to do otherwise is effectively to limit their options because they chose to proceed by way of diversity jurisdiction in federal court, rather than suing in state courts. Such forum punishment reflects a disregard for the spirit of comity that typically prevails when an issue of first impression arises.

## II. The District Court Erred In Concluding That, As A Matter Of Law, That The Plaintiffs Could Not Make Out A Claim For Intentional Infliction Of Emotional Distress

### A. Standard of Review

"In considering a motion to dismiss, we must assume all the facts alleged in the complaint are true…. The complaint must be liberally construed in the light most favorable to the plaintiff. A Rule12(b)(6) motion to dismiss should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle the plaintiff to relief… Whether the complaint states a cause of

21

action is question which this court reviews de novo….” *Coleman v. Watt*, 40 F.3d 255, 258 (8th Cir. 1994) (citations omitted).

### B. Corporate Interference With The Prescription Authority Of Physicians To Care For Their Patients Is Extreme And Outrageous

The plaintiff's intentional infliction of emotional distress claims deserved more than the District Court's backhanded dismissal of the action. To use the rhetorical devise employed by the Court: Is the Court saying we should be prepared to live in a world where corporations get to veto our doctors, especially circumstances where our lives are at stake? Or, put another way, are we to trust Walmart over our family doctor? The law can do better than this.

The Court held that while there may be circumstances in which a “pharmacist's refusal to dispense life-saving medicine to a severely ill patient because of the pharmacist's political beliefs (or because of a policy of the pharmacist's employer could be extreme and outrageous. … [t]his case does not remotely approach those circumstances.” (Add. at 10.) The plaintiffs contend that the Court erred in this value judgment.

Under Minnesota law, intentional infliction of emotional distress consists of four distinct elements: “(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional and reckless; (3) it must cause emotional distress; and

Appellate Case: 22-2960    Page: 28    Date Filed: 12/09/2022 Entry ID: 5225458

(4) the distress must be severe." *Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 864 (Minn. 2003) (internal quotations and citations omitted).

Neither Walmart nor Hy-Vee claimed below that the Saliers failed properly to allege the second and third elements. It is a well-established rule that federal courts do not "entertain arguments made by a party for the first time in a reply brief." *Micek v. Mayo Clinic*, 2021 WL 5282755 at 2 n.2 (D. Minn. 2021) (internal quotations and citations omitted). For purposes of their motions to dismiss, the defendants' failures to contest these elements constitute concessions that the Saliers have alleged that the defendants acted intentionally and recklessly in endangering the Saliers' health and lives. These concessions should have borne tremendous weight in the District Court's consideration of the first and fourth elements.

To satisfy the first element, plaintiffs must allege conduct "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." *Langeslag*, 664 N.W.2d at 865 (internal quotations and citations omitted). In other words, "the conduct must lead an average member of the community to exclaim 'Outrageous!'" *Id*. Thus, "insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not rise to the level of "extreme and outrageous" conduct. *Id*. The purpose of this strict standard is to "prevent fictitious and speculative claims." *Id*. at 866.

23

The fourth element requires the plaintiffs to allege that the distress "inflicted is so severe that no reasonable man could be expected to endure it." *Id.* at 869.

### 1. Counts Three And Four – The Saliers' Claims Against Walmart.

The discussion of the Saliers' claims against Walmart must start with the conceded conduct that the Saliers properly alleged and that Walmart conceded was intentional and reckless.

Walmart's pharmacist called Karla Salier to inform her that Walmart refused to fill Dr. James' prescription of Ivermectin for William Salier and her on the grounds that it was not appropriate to treat COVID-19 patients with it. (App. at 5, R. Doc. 9 at 3.) Karla Salier informed him that William was critically ill, and his survival was at stake if he did not receive the treatment prescribed by Dr. James. (App. at 5, R. Doc. 9 at 3.) Instead of conferring with Dr. James as required by Minn. R. § 6800.3110 subp. 4 or filling the prescription, Walmart's pharmacist lectured her about how Ivermectin was supposedly dangerous for her husband and denied the Saliers life-saving medicine for a second time. (App. at 5, R. Doc. 9 at 3.) When Dr. James attempted to initiate the discussion required by Minn. R. § 6800.3110 subp. 4, the Walmart pharmacist ignored her explanation of the safety of Ivermectin and her warning that William Salier was critically ill. (App. at 5, R. Doc. 9 at 3.) Instead, he attempted to lecture her on how she was imperiling the Saliers' health and then hung up on her. (App. at 6, R. Doc. 9 at 4.)

24

The Walmart pharmacist engaged in this conduct despite being informed of the safety of Ivermectin and being made aware that William Salier's life was at stake. (App. at 5-6, R. Doc. 9 at 3-4.) While the pharmacist paid lip service to the Saliers' health and safety, the Saliers allege that he substituted corporate judgments for Dr. James' reasoned medical judgments as to what was best for Salier. (App. at 12-13, R. Doc. 9 at 10.)

The result of Walmart's conduct was that William and Karla Salier feared that William would lose his life due to COVID-19 as the result of Walmart's intentionally and recklessly denying them appropriate treatment prescribed by their doctor. (App. at 12, R. Doc. 9 at 10.) They endured significant agony as they desperately sought to obtain the treatment elsewhere. (Id.) Their emotional distress ultimately became so severe as they faced William's impending death that they resorted to desperate measures to save their health and William's life. They purchased and consumed horse paste to save their lives instead of being allowed to take FDA-approved compositions of Ivermectin even though it would have constituted an "off-label" usage. (App. at 6-7, R. Doc. 9 at 4-5.)

These facts lead to two clear conclusions. First, despite knowing that William Salier's life was in danger, Walmart denied life-saving treatment to him based on political conclusions rather than sound medical judgment. It did so despite knowing that Ivermectin had an unparalleled safety record. Not content with such politically

25

motivated folly, Walmart's pharmacist then functionally taunted Karla Salier and, by extension, William Salier with a lecture about how they were going to endanger their own health when the pharmacist knew that William Salier was at serious risk of dying from COVID-19 and that withholding Ivermectin would deny him the chance at life that his doctor believed that it would give him.

Words do not do nearly enough justice to encapsulate how outrageous Walmart's conduct was. It denied life-saving treatment to a man in danger of dying on the basis of political conclusions and taunted his desperate wife about it in the process. Its conduct was the equivalent of yanking a life raft away from a drowning man and taunting him as he goes underwater for the final time. A jury will have no difficulty saying "outrageous!" The Court should not either.

Second, the Saliers' emotional distress was so severe that a Marine Corps veteran feared for his life, and he and his wife took desperate measures to save it. The measures that they were forced to resort to were the precise measures that talking heads and government officials had castigated Joe Rogan for when he spoke about the benefits of Ivermectin. Instead of being able to take the medication prescribed by their doctor, the Saliers' emotional distress and despair was so severe that they consumed horse paste to save their lives – the very course of action that government officials had repeatedly warned the public not to take and one that only the gravest necessity drove the Saliers to take.

26

If the Saliers' emotional distress and corresponding actions do not meet the threshold of severe emotional distress, no form of emotional distress will be severe enough to satisfy Minnesota law. No reasonable person could have endured the stress that Walmart subjected the Saliers to after they exhausted every option to save their lives. A jury will have no difficult reaching this conclusion.

## III. The District Court Erred Both In Holding That A Medical Expert Was Necessary To Perfect The Claims Alleged, And, More Significantly, In Refusing Additional Time To The Plaintiffs' To Notice Such An Expert If One Was, In Fact, Necessary

### A. Standard of Review

"In considering a motion to dismiss, we must assume all the facts alleged in the complaint are true…. The complaint must be liberally construed in the light most favorable to the plaintiff. A Rule12(b)(6) motion to dismiss should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle the plaintiff to relief… Whether the complaint states a cause of action is question which this court reviews de novo…." *Coleman v. Watt*, 40 F.3d 255, 258 (8th Cir. 1994) (citations omitted).

### B. A Medical Expert Is Not Required To Establish That Corporations Ought Not To Be Permitted To Interfere With A Physician's Ability To Prescribe "Off-Label" Medications; If One Were Truly Necessary, The Plaintiffs Should Have Been Given Additional Time To Produce The Required Affidavit

27

The District Court misapprehended the nature of the plaintiffs' claims in concluding that they had effectively pleaded a claim for malpractice against the defendants, effectively requiring them to need an expert to show a "prima facies case of malpractice." Because they had not timely noticed reliance on expert, as required under Minn. Stat. § 145.682, the Court concluded there was a separate basis for dismissing the common law claims. "[E]ach of the Saliers' claims is subject to Minn. Stat. § 145.682 because each requires evidence that defendants violated the standard of care applicable to pharmacists." (Add. at 18.)

The Saliers did not sue individual pharmacists for breaching their duty of care in the performance of a discretionary act; they sued two corporations that offer pharmaceutical services for having a policy that required the pharmacist to behave in a ministerial manner, even after the pharmacists had spoken to the Saliers' physicians to discuss the prescriptions at issue here. There was nothing on which an expert would be required to opine. The plaintiffs here complained that corporate fiat and the absence of medical judgment and decision-making was made to trump a physician's well-considered judgment. There was no need for an expert. A jury could well conclude that a corporate office has no business telling doctors what they can and cannot prescribe for their patient. If the defendants wanted an expert to say that their corporate policy, then, and then alone, might an expert have become necessary as such a medical judgment would exceed the ordinary ken of

28

lay jurors. *Chizmadia v. Smiley's Point Clinic*, 873 F.2d 1163, 1165 (8th Cir. 1989). As pleaded, this case is very much like a case in which comparable to "leaving a surgical sponge in a patient's body or amputating the wrong limb." (Add. at 18.) Patients don't expect their medical options to be dictated by a distant C-Suite executive; they want to follow their doctor's orders.

Even if a medical expert were required in this case, the District Court abused its discretion in not permitting additional time to make the disclosure on grounds of "excusable neglect as permitted by Minn. Stat. § 145.682, subdiv. 4(b). The Court concluded that the Saliers "do not have a reasonable suit on the merits,…they have not come close to pleading a viable claim." (Add. at 19; *citing*, *Anderson v. Rengachary*, 608 N.W.2d 843, 850 (Minn. 2000)). As argued in section one of the argument, there is viable common law in this case.

## Conclusion

The plaintiffs request that this Court remand the following question to the Minnesota Supreme Court: Does Minnesota recognize a common-law right to self-determination in medical decision making, and, if so, is a corollary of that right that a pharmacist has a ministerial duty to fill a prescription absent good cause not to do so? The plaintiffs also request that this Court reserve decision on the remaining issues in this case pending a ruling from the Minnesota Supreme Court. In the alternative, should this Court decide against a remand to the Minnesota

29

Supreme Court, the plaintiffs request reversal of the judgment dismissing the case, and a remand of the matter to the District Court for further proceedings.

THE PLAINTIFFS-APPELLANTS

/s/ Norman A. Pattis /s/
NORMAN A. PATTIS, ESQ.
PATTIS & SMITH, LLC
383 Orange Street, 1st Floor
New Haven, CT 06511
Tel: (203) 393-3017
Fax: (203) 393-9745
npattis@pattisandsmith.com

Appellate Case: 22-2960      Page: 36      Date Filed: 12/09/2022 Entry ID: 5225458

## Certificate of Compliance

I hereby certify that the following statements are true:

1. This brief complies with the type-volume limitations imposed by F.R.A.P. 32(a)(7)(B)(i). It contains 5864 words, excluding the parts of the brief exempted by F.R.A.P. 32(f).

2. This brief complies with the typeface and typestyle requirements of F.R.A.P. 32(a)(5) and 32(a)(6). It has been prepared in a proportionally-spaced typeface using Microsoft Office Word 2016 in 14-point Times New Roman font.

3. This brief complies with the electronic filing requirements of Eighth Circuit Rule 28A(h). The latest version of Windows Defender has been run on the files containing the electronic version of this brief and the addendum and no viruses have been detected.

Dated December 9, 2022.

/s/ Norman A. Pattis

Appellate Case: 22-2960   Page: 37   Date Filed: 12/09/2022 Entry ID: 5225458

## Certificate of Service

I hereby certify that, on the above-captioned date, a copy of the foregoing was filed electronically. Notice of this filing was sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Norman A. Pattis

Appellate Case: 22-2960     Page: 38     Date Filed: 12/09/2022 Entry ID: 5225458

## __Addendum__

In accordance with Local Rule 28A(g)(5), the electronic version of the Addendum is filed separately. The paper version of the Addendum begins on the next page of the paper version of this brief.